Nos. 23-1708 and 23-1721

———————————————

In the
United States Court of Appeals
for the Seventh Circuit

———————————————

PRENTISS JACKSON,

*Appellant*,

v.

UNITED STATES OF AMERICA,

*Appellee*.

———————————————

On Appeal from the United States District Court for the
Central District of Illinois
———————————————
Nos. 2:10-cr-20043-JES-JEH-1,
2:22-cr-20044-CSB-EIL-1

———————————————

**DEFENDANT-APPELLANT'S SUPPLEMENTAL APPENDIX**

Anthony J. Dick
Louis J. Capozzi
    *Counsel of Record*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC  20001.2113
+1.202.879.3939
lcapozzi@jonesday.com

*Counsel for Appellant*

*Pro Bono Appointed Counsel for Defendant-Appellant Prentiss Jackson*

**TABLE OF CONTENTS**

| Date | Description | Appendix Pages |
|------|-------------|----------------|
| 11/7/2022 | Hearing Transcript re Motion to Suppress | SA1 – SA72 |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION


**UNITED STATES OF AMERICA,** )
                              )  **Case Number 22-20044**
                  Plaintiff,  )
                              )
          vs.                 )
                              )  November 7, 2022
                              )  1:21 p.m.
**PRENTISS JACKSON,**          )
                              )
                  Defendant.  )



MOTION TO SUPPRESS (#16)


BEFORE THE HONORABLE COLIN S. BRUCE
United States District Judge




Court Reporter:

LISA KNIGHT COSIMINI, RMR-CRR
U.S. District Court
201 South Vine
Urbana, Illinois 61802


Proceedings recorded by mechanical stenography;
transcript produced by computer.

A P P E A R A N C E S :


For the Plaintiff:    **WILLIAM J. LYNCH, ESQUIRE**
                      Assistant United States Attorney
                      201 South Vine Street
                      Urbana, Illinois 61802
                      217-373-5875
                      william.lynch@usdoj.gov


For the Defendant:    **CHARLES G. SCHIERER, ESQUIRE**
                      Schierer & Ritchie
                      1009 Illini Drive
                      East Peoria, Illinois 61611
                      309-839-2024
                      chuck.schierer@gmail.com

```
1                   (In open court, 1:21 p.m.)

2              COURTROOM DEPUTY:  This is Case 22-cr-20044,

3    United States v. Prentiss Jackson.

4              THE COURT:  All right.  The United States is

5    represented by Assistant U.S. Attorney Will Lynch.

6              The defendant's represented by his attorney,

7    Chuck Schierer.  The defendant's also present.

8              The matter comes on today for a suppression

9    hearing.

10             Mr. Lynch, you ready to proceed?

11             MR. LYNCH:  Yes, Your Honor.

12             THE COURT:  Mr. Schierer, you ready?

13             MR. SCHIERER:  Yes, Judge.

14             THE COURT:  All right.  Mr. Lynch.

15             MR. LYNCH:  Your Honor, the government will

16   call Officer Barrie.

17                  (Witness Barrie sworn, 1:22 p.m.)

18        DIRECT EXAMINATION OF PHILLIP BARRIE

19   BY MR. LYNCH:

20   Q.  Would you please state your name?

21   A.  Yes.  My name is Phillip Barrie.

22   Q.  Would you please spell it as well?

23   A.  Yes.  P-h-i-l-l-i-p, B-a-r-r-i-e.

24   Q.  Where do you work?

25   A.  I work at the Urbana Police Department.
```

```
1   Q.   What's your job there?

2   A.   I'm a patrol officer.

3   Q.   What sorts of things do you do for the Urbana

4   Police Department as a patrol officer?

5   A.   I respond to calls for service and do traffic

6   enforcement.

7   Q.   Have you received any particular training to -- in

8   regards to traffic enforcement?

9   A.   I have.

10  Q.   What's that?

11  A.   I received training at the Police Training

12  Institute at the University of Illinois.

13  Q.   Is this -- have you ever held any other law

14  enforcement job?

15  A.   I have not.

16  Q.   What prior jobs have you held?

17  A.   I was the clinical manager at Christie Clinic in

18  Urbana prior to this.  And before that, I was a United

19  States Navy corpsman with the Marine Corps.

20  Q.   How long have you been employed with the Urbana

21  Police Department?

22  A.   For three years.

23  Q.   And in those three years, have you been a patrol

24  officer the entire time?

25  A.   I have.
```

1    Q.   Were you sworn and on duty on June 11th of 2022?

2    **A.   I was.**

3    Q.   And what were your assigned duties on June 11th,

4    2022?

5    **A.   My assigned duties were to respond to calls for**

6    **service and traffic enforcement.**

7    Q.   What shift were you working on June 11th?

8    **A.   I was working the third shift, or the night shift.**

9    Q.   And, generally speaking, what hours does that

10   cover?

11   **A.   It starts from 7:00 p.m. until 7:00 a.m.**

12   Q.   Was there a particular area of town that you were

13   patrolling?

14   **A.   Yes.**

15   Q.   What was that?

16   **A.   I was patrolling the northern portion of the town.**

17   Q.   And at any point in the time that you were

18   patrolling Urbana that night, did you have occasion to

19   be on University Avenue?

20   **A.   Yes, I did.**

21   Q.   Could you briefly describe University Avenue?

22   **A.   University Avenue is a very large municipal road**

23   **that starts from the -- I-74 and goes all the way to**

24   **Champaign.**

25   Q.   How many lanes is that?

1  **A.   It's four lanes and a turn lane.**
2  Q.   And am I correct that this is a public road --
3  being a highway -- for Illinois Vehicle Code purposes?
4  **A.   It is.**
5  Q.   While you were -- did you have occasion to be on
6  University Avenue on June 11th?
7  **A.   Yes, I did.**
8  Q.   When you were on University Avenue, did you
9  observe anything that caught your eye?
10 **A.   Yes.**
11 Q.   What was that?
12 **A.   Approximately 12 minutes past midnight, I observed**
13 **a white Dodge Charger traveling westbound on the 100**
14 **block of West University Avenue without its headlights**
15 **or taillights activated.**
16 Q.   How were you able to determine that it did not
17 have headlights or taillights activated?
18 **A.   I was actually driving eastbound on University and**
19 **passed it, and then I turned around behind it and**
20 **noticed that its headlights and taillights were not on.**
21 Q.   When you turned around to get behind it, did you
22 do anything in response to what you had observed?
23 **A.   Yes.   I conducted a traffic stop on the vehicle.**
24 Q.   Did you turn on your -- or excuse me.
25      What vehicle were you driving?

1  **A.    I was driving a marked patrol vehicle for the City**

2  **of Urbana.**

3  Q.    How did you let the other driver know that you

4  wanted him to pull over?

5  **A.    I activated my emergency overhead lights.**

6  Q.    Did that vehicle come to a full and complete stop?

7  **A.    It did.**

8  Q.    Where?

9  **A.    Approximately the 1000 block of West University**

10  **Avenue.**

11  Q.    And what buildings or businesses are near at that

12  location?

13  **A.    The Pawn King is north of it, and Taco Bell is**

14  **south of that location.**

15  Q.    The vehicle that you described earlier, what was

16  that again?

17  **A.    A white Dodge Charger.**

18  Q.    Was that a motor vehicle?

19  **A.    Yes.**

20  Q.    Being self-propelled?

21  **A.    Yes.**

22  Q.    When you pulled that vehicle over, did you resolve

23  to do anything further in regards to that stop?

24  **A.    Yes.**

25  Q.    What was that?

1    **A.    I approached the vehicle and talked to the driver**

2    **and informed him of why I had conducted the traffic**

3    **stop:  because the lights were not activated.**

4    Q.   Okay.  When you informed the driver of this, where

5    was -- was the window up or down between you and the

6    driver, of the driver's car?

7    **A.    When I initially approached, it was up; and I**

8    **knocked on the window, and he rolled it down.**

9    Q.   Now, you said "he" several times.  Who was "he"?

10   **A.    Prentiss Jackson.**

11   Q.   Do you see Prentiss Jackson in the courtroom

12   today?

13   **A.    I do.**

14   Q.   Where is he seated?

15   **A.    He's seated directly across from me with the long**

16   **hair and the orange suit.**

17          MR. LYNCH:  May the record reflect the

18   identification of the defendant by the witness?

19          THE COURT:  It can so reflect.

20          MR. LYNCH:  Thank you.

21   BY MR. LYNCH:

22   Q.   When you interacted with Mr. Jackson, you stated

23   that you told him the reason for the stop; is that

24   right?

25   **A.    I did.**

1  Q.   When you were in the process of doing that, did

2  you notice anything?

3  **A.   Yes.**

4  Q.   What?

5  **A.   I could smell cannabis emitting from inside the**

6  **vehicle.**

7  Q.   Now, have you had occasion to experience the smell

8  of cannabis in your professional life?

9  **A.   Yes.   Numerous times.**

10 Q.   Both in training and while on duty as a patrol

11 officer?

12 **A.   Yes.**

13 Q.   What, if any, ability do you have to distinguish

14 between burnt and unburnt cannabis?

15 **A.   I'm able to determine if its burnt or unburnt.**

16 Q.   The smell of cannabis that you described smelling

17 at this moment in time speaking with Mr. Jackson, are

18 you able to give it a quality as to whether it was

19 burnt or unburnt?

20 **A.   It was unburnt.**

21 Q.   And did you smell the smell before you walked up

22 to Mr. Jackson's vehicle?

23 **A.   I did not.**

24 Q.   Did you smell this smell while you were at

25 Mr. Jackson's vehicle before his window was rolled

1    down?

2    **A.    No, I didn't.**

3    Q.   When the window was rolled down, did you have an

4    opinion as to where the smell was coming from?

5    **A.    Yes.  I could immediately determine it was coming**

6    **from inside the motor vehicle.**

7    Q.   Now, when you told Mr. Jackson the reason for the

8    stop, did Mr. Jackson do anything in response to that?

9    **A.    Yes.  He activated his headlights and taillights.**

10   Q.   Did you see them come on?

11   **A.    Yes, I did.**

12   Q.   Now, having done that to Mr. Jackson and

13   incorporating the smell, did you resolve to do anything

14   further in the course of the stop?

15   **A.    Yes.**

16   Q.   What was that?

17   **A.    I had asked him for his identification and**

18   **insurance, which he provided.  And then I had asked him**

19   **if he had smoked cannabis.**

20   Q.   What was his response to if he had smoked

21   cannabis?

22   **A.    He admitted that he had smoked.**

23   Q.   Now, did he give you a location about where he

24   smoked the cannabis?

25   **A.    No.**

Q.   Did he state about whether or not he smoked
cannabis in the car?

**A.   He said he did not smoke in the vehicle.**

Q.   I'm sorry.  What was that answer?

**A.   He said he did not smoke in the vehicle.**

Q.   Now, once you heard that information, did you
eventually conclude looking at Mr. Jackson's license
and insurance information?

**A.   After learning that information, I determined that
this could possibly be a DUI investigation due to the
IVC violation of late night and because he admitted he
had smoked and because I was smelling cannabis.**

Q.   Now, does the smell of cannabis inside of a motor
vehicle alert you to any other potential violations of
Illinois law?

**A.   Yes, it does.**

Q.   What?

**A.   The adult use of cannabis in a motor vehicle
states that cannabis should be in an approved odorless
container not in the confines of a motor vehicle within
reach of a passenger or a driver.**

Q.   And am I correct that it is your testimony today
that, being able to smell unburnt cannabis from the
interior of the vehicle, it was your suspicion that the
adult use cannabis violation under the Illinois Vehicle

1   Code may be an issue?

2   **A.   Correct.**

3   Q.   Because you could smell it?

4   **A.   That's correct.**

5   Q.   Once you had -- excuse me.

6        Based on the foregoing, what did you do next?

7   **A.   I had informed Mr. Jackson about the adult use**

8   **cannabis Illinois Vehicle Code, and I had instructed**

9   **him -- or I had told him that I was going to proceed**

10  **with a search of him and the vehicle and asked him to**

11  **exit the vehicle.**

12  Q.   Did you do anything to make your search of the

13  vehicle and/or him easier?

14  **A.   I did.**

15  Q.   What was that?

16  **A.   I had asked him to turn off the motor vehicle, and**

17  **I had confiscated his keys for a brief moment.**

18  Q.   Did you do this forcefully?

19  **A.   I did not.**

20  Q.   How did you obtain the keys in particular?

21  **A.   I asked him for them, and he handed them to me.**

22  Q.   Now, after he had handed them to you, did you

23  inform him how the stop would proceed?

24  **A.   Yes, I did.**

25  Q.   And what was that?

1   A.   I told him that I was going to search him and the

2   vehicle and asked -- told him that I was going to start

3   with him and asked him to step out of the motor

4   vehicle.

5   Q.   Now, had you told him anything else apart from how

6   the stop was going to proceed?

7   A.   I don't believe so.

8   Q.   Did you make any statements to Mr. Jackson in

9   order to elicit the location of the cannabis that you

10   believed you smelled?

11   A.   I believe I had told him that I could smell it

12   coming from inside the vehicle, and then he had

13   found -- or he had retrieved a baggie of cannabis

14   inside the vehicle and handed it to me.

15   Q.   Now, am I correct that this was done after you had

16   suggested to Mr. Jackson that you may be able to cut

17   breaks if he were to hand you any cannabis that may be

18   the offending cannabis in the vehicle?

19   A.   Yes.

20   Q.   And he initially did not do so?

21   A.   That's correct.  He initially told me there was

22   nothing in the vehicle.

23   Q.   And after several more times, did he eventually

24   hand you what you believed to be cannabis?

25   A.   Yes, he did.

1    Q.   What made you believe that what he handed you was

2    cannabis?

3    **A.   He admitted that it was weed, and it smelled very**

4    **strongly of unburnt cannabis.**

5    Q.   In what sort of packaging was it handed over to

6    you?

7    **A.   It was in a tied-off plastic sandwich baggie.**

8    Q.   Were you able to smell cannabis?

9    **A.   Yes.**

10   Q.   After he handed you this baggie of cannabis, what

11   did you proceed to do next?

12   **A.   I informed him that the baggie that it was in was**

13   **not an approved container and then told him to exit the**

14   **vehicle.**

15   Q.   When you told him to exit the vehicle, what was it

16   that you were going to do next once he exited the

17   vehicle?

18   **A.   I was going to direct him to the back of the motor**

19   **vehicle, proceed with a pat-down search, and then**

20   **conduct standardized field sobriety testing.**

21   Q.   What is the purpose of conducting standardized

22   field sobriety tests in a traffic stop?

23   **A.   To determine if the driver is under the influence**

24   **of any intoxicating compound and to see if they're safe**

25   **enough to drive.**

1  Q.   Am I correct that under Illinois law cannabis can,

2  but not necessarily in every circumstance, provide

3  sufficient influence that a driver is incapable of

4  driving?

5  **A.   That's correct.**

6  Q.   When you instructed him to exit the vehicle and go

7  to the rear of the car after having been handed this

8  cannabis by him, did you touch him at any time?

9  **A.   After he got out of the vehicle, I put my hand on**

10 **his arm to direct him to the back of the vehicle since**

11 **it was such a busy highway.**

12 Q.   Could you describe how he walked to the rear of

13 the vehicle?

14 **A.   Yes.  He willingly got out of the car, calmly**

15 **walked to the back of the vehicle, and turned around**

16 **towards his vehicle.**

17 Q.   Did he place his hands on the trunk?

18 **A.   He did.**

19 Q.   Now, when he had his hands on the trunk and you

20 had briefly touched his arm at that point directing him

21 to the rear, did you have any suspicion that

22 Mr. Jackson had any item in particular on his body?

23 **A.   No.**

24 Q.   Did you feel anything when you touched his arm?

25 **A.   I did not.**

1  Q.   Did you see anything on his body when he was

2  walking to the rear of the vehicle?

3  **A.   I did not.**

4  Q.   When he was at the rear of the vehicle, what

5  happened?

6  **A.   I had returned my flashlight to the holster; and**

7  **as soon as I did that, he fled southbound across**

8  **University Avenue.**

9  Q.   Approximately how many lanes of traffic did he

10 flee over?

11 **A.   That would have been approximately four or five**

12 **lanes.**

13 Q.   Where did he flee?

14 **A.   He fled into the Taco Bell parking lot.**

15 Q.   When he fled into the Taco Bell parking lot, what

16 did you do?

17 **A.   I pursued after him on foot.**

18 Q.   Could you describe that pursuit?

19 **A.   Yes.  During the pursuit, Mr. Jackson quickly ran**

20 **southbound.  I pursued after him.  And as soon as we**

21 **got to roughly the, the southern portion of the parking**

22 **lot, Mr. Jackson began grabbing his waistband.  I**

23 **yelled for him to stop grabbing his waistband, and then**

24 **he pulled out a handgun.**

25 Q.   What made you think it was a handgun?

1    A.    I've had plenty of experience with firearms, and I
2    know what a handgun looks like.
3    Q.    And is this prior experience drawing on your time
4    in the service?
5    A.    Yes.
6    Q.    As well as your training as a police officer?
7    A.    Yes.
8    Q.    And, in fact, do you carry a handgun as part of
9    your normal uniform?
10    A.    I do.
11    Q.    Approximately how far away from you -- or excuse
12    me.
13              Approximately how far away from Mr. Jackson
14    were you when you saw what you saw?
15    A.    Approximately, I would say, 5 feet.
16    Q.    What happened to the handgun that he took out of
17    his waistband?
18    A.    He dropped it at his feet as he tripped.
19    Q.    And as he tripped, what happened next?
20    A.    I quickly got on top of Mr. Jackson to restrain
21    his arms so he could not go for the handgun.
22    Q.    At any time before the handgun had come out in
23    plain view, did you believe Mr. Jackson to have a
24    handgun on his person?
25    A.    I did not.

```
 1              (Brief pause in proceedings.)
 2   Q.  At any time during the stop, were you able to
 3   perform standardized field sobriety tests?
 4   A.   I was not able to.
 5   Q.   Why?
 6   A.   He had fled before I could conduct the
 7   standardized field sobriety testing.
 8   Q.  Did you instruct him to flee?
 9   A.   I did not.
10           MR. LYNCH:  No further questions.
11           THE COURT:  Whenever you're ready,
12   Mr. Schierer.
13           CROSS-EXAMINATION OF PHILLIP BARRIE
14   BY MR. SCHIERER:
15   Q.  Good afternoon, Officer.
16   A.   Good afternoon.
17   Q.  Earlier right before the hearing, you and I met,
18   correct?
19   A.   That's correct.
20   Q.  All right.  We exchanged pleasantries, shook
21   hands, right?
22   A.   That's correct.
23   Q.  And that was the very first time you had ever met
24   me, right?
25   A.   That's correct.
```

1  Q.   Right.

2        Other than some billboards, you've never seen

3  my face, right?

4  **A.   Correct.**

5  Q.   I'm only kidding.  I'm not on billboards.

6        But government counsel here, you've met him

7  before, right?

8  **A.   I have.**

9  Q.   And, in fact, you met with him -- or at least

10  spoke with him -- prior to today's hearing, right?

11  **A.   I have.**

12  Q.   You discussed what questions might be asked,

13  right?

14  **A.   He had showed me the video of what was coming up**

15  **today.**

16  Q.   Okay.  And you had your report with you, right?

17  **A.   I did not bring my report with me.**

18  Q.   But you reviewed it prior to meeting with him,

19  correct?

20  **A.   I did.**

21  Q.   And you watched the video.  Did you actually watch

22  it with him or while he was on the phone or --

23  **A.   So I had watched it prior to meeting with him, and**

24  **then I had watched it with him.**

25  Q.   Okay.  And you guys talked in some general terms

```
 1   about the facts of this case, right?
 2   A.   I, I don't recall exactly what we talked about,
 3   but it was -- I believe it was, pertained to the video.
 4   Q.   Well, you didn't talk about the Fighting Illini,
 5   right?  You talked about this case?
 6   A.   Yes.
 7   Q.   Okay.  Now, one of the things that, that stuck out
 8   to me is:  When you testified, you described it as a
 9   white Dodge Charger.  And I assume you've done hundreds
10   of traffic stops, right?
11   A.   I have.
12   Q.   So that memory was based on you reviewing the
13   video, right?
14   A.   Yes.
15   Q.   And reviewing your police report, right?
16   A.   Yes.
17   Q.   And perhaps even conversations with the
18   government, right?
19   A.   I don't know if I ever mentioned the Charger to
20   him.
21   Q.   Okay.  But, I mean, part of your testimony
22   today -- it isn't entirely based on your independent
23   memory; it's, it's somewhat based on reviewing your
24   report, watching the video, and talking with the
25   government, correct?
```

```
 1   A.    I think that's accurate.

 2   Q.    Okay.  It's also accurate that none of it would be

 3   because of conversations with me, right?

 4   A.    That's correct.

 5   Q.    All right.  Now, you observed a vehicle on

 6   University Avenue in Champaign, right?

 7   A.    It was in Urbana.

 8   Q.    In Urbana.  I apologize.

 9         It's past midnight, right?

10   A.    Yes.

11   Q.    And that's -- I understand that you're on some

12   traffic duty, some of which you're looking for are

13   DUIs, right?

14   A.    Correct.

15   Q.    And in your experience, you do see vehicles

16   operate erratically, which causes you to have some

17   suspicion that -- especially at that time of night --

18   that you might have a DUI situation, right?

19   A.    Not all DUIs drive erratically.

20   Q.    Sure.

21         But that does get your attention, --

22   A.    Sure.

23   Q.    -- right?

24         All right.  It could be speeding.  It could be

25   going the wrong way down the road.  Heck, it could even
```

```
 1  be driving without your lights on, right?
 2  A.  Sure.
 3  Q.  All right.  And in this instance, you saw a
 4  vehicle operating without lights, and so you pulled up
 5  behind it, correct?
 6  A.  Yes, I did.
 7  Q.  And turned on your lights, right?
 8  A.  My emergency overhead lights.
 9  Q.  Okay.
10  A.  Yes.
11  Q.  You're the only officer in that squad car at that
12  time?
13  A.  I am.
14  Q.  And prior to you turning on your emergency lights,
15  could you see that there were two occupants in the car?
16  A.  No.  I could not.
17  Q.  All right.  Had you ever seen that car before?
18  A.  Not to my knowledge.
19  Q.  And did you call for backup immediately?
20  A.  I did not.  However, there was multiple officers
21  on that roadway that heard me conducting the traffic
22  stop, so they showed up.
23  Q.  Okay.  And, in fact, many of them show up before
24  you even pull Mr. Jackson out of the car, correct?
25  A.  Yes.
```

1   Q.   Okay.  So, you approached the vehicle and -- well,

2   let me back up.

3           When you turn on your lights, the vehicle

4   pulls over in an appropriate amount of time, correct?

5   **A.   Yes.**

6   Q.   And, in fact, in your experience, you've seen some

7   suspects not pull it over very quickly, right?  Maybe

8   they go a couple of blocks; maybe they speed up.

9   Right?  You've seen that, right?

10  **A.   Yes, I have.**

11  Q.   And that certainly is alarming to you because you

12  don't know what you're about to find, right?

13  **A.   Correct.**

14  Q.   In this instance, you didn't have that, correct?

15  **A.   Correct.  He pulled over.**

16  Q.   You have somebody pulling over, so you don't have

17  that aspect of fear that might be injected by a

18  different type of behavior, right?

19  **A.   Sure.**

20  Q.   All right.  And you approach the vehicle -- and,

21  again, let's talk about your experience.  I'm sure

22  you've approached vehicles where the occupant begins

23  acting strangely; either they're reaching around the

24  compartment, or they're flailing arms out the windows

25  or shouting nonsense, right?  You've seen that?

1    **A.    Yeah.   Just about every interaction is different.**

2    Q.   Right.

3         But you've seen some of those examples of what

4    I just indicated?

5    **A.   Yes.**

6    Q.   And that can be alarming to you, --

7    **A.   Yes.**

8    Q.   -- correct?

9         Because they're acting strange, right?

10        But in this instance, you don't have that

11   either, right?  Fair?

12   **A.    I mean, he -- I could smell cannabis coming from**

13   **the vehicle.   I would label that as strange.**

14   Q.   Well, let's back up.  I'm talking about when you

15   exit your squad car and as you're approaching this

16   vehicle that you've just pulled over, Officer.

17   **A.   Okay.**

18   Q.   All right.  So I'm focusing in on that moment.

19        You're not observing erratic behavior inside

20   the car.  You're not observing him shouting and doing

21   crazy stuff out the window.  Correct?

22   **A.   Correct.**

23   Q.   All right.  And as you approached the vehicle, I

24   believe it was your testimony you didn't smell

25   anything, right?

1  **A.    That's correct.**

2  Q.   All right.  So, you see a car operating without

3  its lights on.  You activate your emergency lights and

4  pull behind it.  And as you're approaching, physically

5  approaching the driver side window, so far there isn't

6  anything new to cause some alarm, right?

7  **A.   Correct.**

8  Q.   Fair?  Okay.

9          As you approach the vehicle, you could see

10 that there was a passenger?

11 **A.   I could not.   The windows were too tinted.**

12 Q.   Okay.  So when you get to the driver side window,

13 I think your testimony was that he lowered the window,

14 right?

15 **A.   He did.**

16 Q.   Okay.  Again, that is somewhat of a, of a -- an

17 action that makes you have some level of comfort; is it

18 not?  Now you don't have to argue or fight with the

19 suspect over having some simple communication through a

20 window, right?

21 **A.   Are you asking me if I was comfortable that he**

22 **rolled the window down?**

23 Q.   Yeah.

24 **A.   Yes.**

25 Q.   All right.  And at that point, you could see into

1    the compartment of the vehicle, right?

2    **A.    I could see into the front compartment.   Correct.**

3    Q.   All right.  And it's at that point you could see a

4    female passenger, right?

5    **A.   Yes.**

6    Q.   And I'm talking about your initial observation.

7    Okay?  I understand that she had some -- later on she

8    had some issues with your analysis of the law, and you

9    guys may have had a conversation about that.

10            But initially she doesn't appear to be in any

11    distress, right?

12    **A.   Not that I could determine.**

13    Q.   All right.  Because you would look for something

14    like that, correct?

15    **A.   Yes.**

16    Q.   Especially at that time of night, right?  All

17    right.

18            So you also -- as you're looking into that

19    front compartment, you don't see alcohol, open

20    containers?

21    **A.   I did not see any alcohol.**

22    Q.   All right.  I once lived in Missouri.  And, you

23    know, you can drive with open containers, right?  Seems

24    a little strange, right?  We don't do that here in

25    Illinois.

1          And, but you're not seeing that, but that's

2    something that you look for late at night when you're

3    making traffic stops, correct?

4    **A.    That's correct.**

5    Q.    You don't -- I believe it was your testimony there

6    was no burnt cannabis smell, correct?

7    **A.    Not that I could smell.**

8    Q.    But, of course, we have more senses than just our

9    sense of smell, right?  So you observe in that moment.

10          You don't see a joint, right?

11   **A.    Yes.  I did not see a joint.**

12   Q.    You don't see ashes.  You don't see the lighter.

13   You don't see burnt -- you know, papers or stuff like

14   that --

15   **A.    That's correct.**

16   Q.    -- that might be associated with smoking?  Okay.

17          And, in fact, you don't even see smoke rolling

18   out of the windows, right?

19   **A.    That's correct.**

20   Q.    Okay.  Because you've seen that, too, right?

21   **A.    I have.**

22   Q.    As windows roll down, then you get this waft of

23   smoke coming out.  That, that did not happen?

24   **A.    That's correct.**

25   Q.    Now, there's other things that you don't observe.

```
 1   You don't observe any weapons, right?
 2   A.   That's correct.
 3   Q.   And, in fact, when you -- and you don't observe
 4   any strange movements by the defendant?
 5   A.   That's not correct.
 6   Q.   Okay.  Well, you engage him in some conversation?
 7   A.   Yes.
 8   Q.   And his responses are appropriate responses,
 9   correct?  I mean, in that you asked for his license,
10   his registration, and he seems to understand your
11   question, right?
12   A.   Yes.  He seemed to understand.
13   Q.   You've made several traffic stops, and I bet
14   you've done lots of DUI arrests, correct?
15   A.   Yes.
16   Q.   And you've seen individuals who don't seem to
17   understand a darn thing that you just said?
18   A.   Yes.
19   Q.   Okay.  That's not this case, right?
20   A.   I would argue that's not correct.
21   Q.   Really?
22   A.   Yes.
23   Q.   Okay.  So he's asking you -- you're asking him
24   questions, and he demonstrates to you that he has no
25   concept of what you're asking?
```

A.    Just because you answer questions appropriately
does not mean you're not driving under the influence,
sir.

Q.    Okay.  Well, you testified earlier that you asked
for registration and license, right?

A.    I had asked him for his driver's license and proof
of insurance.

Q.    Okay.  And he provided that?

A.    He provided me with an identification card, but
that was not a driver's license.

Q.    Okay.  All right.  And what, what other questions
do you recall asking him?

A.    I had informed him that I could smell cannabis,
and I had asked him if he had smoked cannabis
tonight -- or that night.

Q.    Okay.  And what was his -- what was his response?

A.    He said he had.

Q.    All right.  So, you asked a question.  He appeared
to understand the question and responded to you, right?

A.    Yes.

Q.    All right.  It wasn't a slurred response, right?

A.    I'm -- I don't believe it was slurred.

Q.    Okay.  It wasn't an incoherent response, correct?

A.    It was not.

Q.    And you were satisfied with the answer, --

1  **A.   Yes.**

2  Q.   -- correct?  All right.

3           Now, when you -- well, you've been trained to

4  look for people who are impaired during traffic stops,

5  right?

6  **A.   Yes.**

7  Q.   And as part of your training, you are trained to

8  put some of those observations in your report, right?

9  **A.   Correct.**

10  Q.   Now, these reports -- unfortunately, you're not

11  typing them up at the exact same time that you're

12  perceiving things, right?

13  **A.   Yes.**

14  Q.   But when you make reports, you might go back and

15  watch the video or talk to a partner who was there with

16  you, correct?

17  **A.   Yeah.**

18  Q.   And that might assist you in, in making your

19  report.

20           Do you always go back and watch the video, or

21  is that just sometimes you do that?

22  **A.   Just sometimes.**

23  Q.   All right.  Do you have a very specific memory of

24  typing up this report that -- for Mr. Jackson?

25  **A.   Yes.**

```
 1   Q.   Okay.  Did you watch the video?
 2   A.   I believe I did.
 3   Q.   Okay.  And when you did that, did you have a
 4   supervisor there with you watching it?
 5   A.   No.  I did not.
 6   Q.   You were just alone?
 7   A.   I, I believe there may have been another officer
 8   in our report-writing room, I just don't remember who
 9   it was.
10   Q.   Okay.  Did you have someone else watching the
11   video with you?
12   A.   No.
13   Q.   No?  Okay.
14        All right.  So, you're trained to look for
15   impairment, right?  Signs of impairment?
16   A.   Yes.
17   Q.   All right.  What are some of those -- the more
18   common signs of impairment that you're looking for?
19   A.   The most common sign is the odor of cannabis or
20   alcohol.  The next sign is slurred speech, --
21   Q.   Okay.
22   A.   -- asleep at the wheel, or committing a traffic
23   violation.
24   Q.   Okay.  All right.  So odor -- you smell what you
25   indicated was unburnt cannabis?
```

1  A.   Yes.

2  Q.   All right.  So the -- is it -- now, I assume when

3  you did your training they gave you some instruction on

4  the science behind cannabis and how it might intoxicate

5  somebody, correct?

6  A.   I believe so.

7  Q.   And you've probably received some training on how

8  alcohol impairs a person, correct?

9  A.   Yes.

10 Q.   All right.  During all of that training, has --

11 have you received any training that unburnt cannabis,

12 just the green stuff, makes people impaired?

13 A.   It can make people impaired if it's in, added to

14 foods or other compounds like that.

15 Q.   Oh, okay.

16        Ingested in some other fashion?

17 A.   Correct.

18 Q.   Oh, okay.

19        And you observed brownies in the compartment

20 of the car?

21 A.   I did not.

22 Q.   You observed crumbs on his face?

23 A.   I did not.

24 Q.   No.

25        In fact, you didn't observe any beverages or

1  anything in the front compartment?

2  **A.   Not to my knowledge.**

3  Q.   All right.  So you had no observation that he had

4  consumed a food product with unburnt cannabis in it,

5  correct?

6  **A.   Not to my observation.**

7  Q.   He obviously wasn't asleep, right?  Another one of

8  your big observations?

9  **A.   Correct.**

10 Q.   All right.  He was alert, correct?

11 **A.   Yes.**

12 Q.   He was responsive, --

13 **A.   He was.**

14 Q.   -- correct?  Okay.

15       And as you indicated earlier, his speech was

16 not slurred, correct?

17 **A.   Correct.**

18 Q.   Now, you indicate that you -- your testimony was

19 that you suspected impaired driving?

20 **A.   I did.**

21 Q.   Okay.  Now, in putting -- putting together a

22 report after the fact, is it important to you to

23 include all relevant facts?

24 **A.   I did not include that fact because I did not get**

25 **to the SFSTs.**

```
 1   Q.   Hang on a second.
 2   A.   Oh, okay.
 3   Q.   Please answer the question I'm asking you.
 4   A.   All right.
 5   Q.   Is it -- in putting together reports, is it
 6   important to you as a professional police officer to
 7   include relevant facts?
 8   A.   Yes.
 9   Q.   And, in fact, you're trained to include relevant
10   facts?
11   A.   Yes.
12   Q.   And your reports are sometimes, I assume -- maybe
13   it's all the time -- reviewed by a supervisor?
14   A.   Yes.  All reports are reviewed.
15   Q.   And then do you have some type of conversation
16   with a supervisor after the fact, or do they only bring
17   you in to have a conversation if there's a problem with
18   the report?
19   A.   Yeah.  If that report does not meet their
20   standards, they'll call you.
21   Q.   And that did not happen in this case?
22   A.   It did not.
23   Q.   Okay.  So in this case, you were the one who typed
24   up the report by yourself, right?
25   A.   Yes.
```

1   Q.   Presumably, if everything worked properly, a

2   supervisor reviewed your report, correct?

3   **A.   Yes.**

4   Q.   And in your report, you didn't indicate that you

5   were suspecting impaired driving?

6   **A.   Would you like me to answer it why, sir?  Or just**

7   **yes or no?**

8   Q.   Let's just start with yes or no.

9   **A.   Okay.  I did not.**

10  Q.   Oh, okay.  All right.

11         But, earlier, you had testified that it's

12  important to you to put all relevant information in the

13  report, --

14  **A.   Yes.**

15  Q.   -- right?  All right.

16         Now, I understand you really want to explain

17  why you didn't include it.  Please explain.

18  **A.   Yes, sir.  So I had not got to the point where I**

19  **could do standardized field sobriety testing on**

20  **Mr. Jackson.  And since I didn't get to that point and**

21  **made the arrest, I just covered the facts of the case**

22  **that I had obtained.**

23  Q.   Okay.  But, sir, when you conduct a traffic stop

24  and you have a suspicion of a DUI -- right? -- that

25  begins with an observation.  The suspicion alone,

1 correct?

2 **A.    That's correct.**

3 Q.    All right.  And the reason for that, Officer, is

4 that you're trained to make sure that you can justify

5 the duration of the traffic stop, correct?

6 **A.    Yes.**

7 Q.    Right.

8          Because you know that in a situation where,

9 let's say, you stop a guy for just speeding, you can't

10 keep him there for 60 minutes to just write a ticket,

11 right?  They, they teach you that?

12 **A.    That's correct.**

13 Q.    And if you make certain observations, you've got

14 to be able to justify it in case you're testifying

15 about it at some time in the future about why you kept

16 that suspect a certain amount of time, correct?

17 **A.    Yes.**

18 Q.    All right.  So, when you make certain

19 observations, it's important to put it in reports.  You

20 would agree with that, right?

21 **A.    Yes.**

22 Q.    All right.  So the observations that he might be

23 impaired you would typically include in a report,

24 right?

25 **A.    Yes.**

1    Q.   Okay.  And in this case, you didn't?

2    **A.   I did not put that in my report.**

3    Q.   Now, you observe a vehicle traveling without

4    lights on.  You pull it over.  And you go up.  And one

5    of the very first things you say to him -- if not the

6    first thing is my memory from watching the video -- is

7    that you tell him:  *Hey, buddy.  You're driving without*

8    *your lights on.*  Right?

9    **A.   That's correct.**

10   Q.   And he seemed surprised that -- *Oh, I'm driving*

11   *without my lights on; I didn't realize that.*  Right?

12   **A.   Yes.  He did seem surprised.**

13   Q.   And his -- and then I think one of his -- the next

14   thing he does is he turns the lights on?

15   **A.   He does.**

16   Q.   Right.

17        So the original purpose of your stop was to

18   make -- to, to investigate this guy who was driving

19   without his lights on, right?  And you, you

20   accomplished that, right?  *Turn on your lights.*  And

21   you curb the car, and you approach the suspect, right?

22   **A.   Yes.**

23   Q.   He acknowledges to you -- in fact, maybe even

24   thanks you -- and turns on the lights, right?

25   **A.   I don't know if he thanked me for it, but he did**

1    **turn his lights on.**

2    Q.   Well, if he didn't, let me thank you on behalf of

3    him.

4         And then you must have got out your machine to

5    write the ticket, and you immediately wrote him a

6    ticket for operating a vehicle without a light,

7    correct?

8    **A.   No.  Because when I was talking, when -- as I was**

9    **telling him, then I could smell the odor of unburnt**

10   **cannabis, which I know is another Illinois Vehicle Code**

11   **violation.**

12   Q.   Okay.  And so you, you did not write him a ticket

13   for the lights, right?

14   **A.   I eventually wrote him a warning ticket.**

15   Q.   But you didn't write him a traffic citation at

16   that very moment, correct?

17   **A.   That's correct.**

18   Q.   All right.  I apologize if I'm asking you this

19   question again, but you never observed -- inside the

20   vehicle, when you have the vehicle stopped, you don't

21   observe any weapons, right?

22   **A.   I did not.**

23   Q.   And until he shows you a bag of suspected

24   cannabis, you couldn't in plain sight see any drugs?

25   **A.   That's correct.**

1   Q.   So as you're standing looking into the car, which

2   I assume you're trained to kind of look around for

3   things?

4   **A.   Yes.**

5   Q.   And I assume you follow that training, and you

6   look around for things, correct?

7   **A.   Yes, I did.**

8   Q.   And, in fact, you might even look in the back seat

9   to kind of make sure there's not somebody sitting back

10  there, right?

11  **A.   Yeah.   Initially, I couldn't see because the**

12  **windows were up, and they were tinted.**

13  Q.   Were you able to see, when he rolled the window

14  down, --

15  **A.   Yes.**

16  Q.   -- into the back seat?

17  **A.   Yes.**

18  Q.   Okay.  And there wasn't anybody back there, right?

19  **A.   Not that I could see.**

20  Q.   And, in fact, you didn't see any weapons back

21  there, right?

22  **A.   Not that I could see.**

23  Q.   Now, I believe your words to him when you're

24  having this conversation is:  *I smell a little bit of*

25  *weed*.  Right?

1    A.    Yes.

2    Q.    All right.  Now, I happened to notice that when I

3    read your police report and -- strike that.

4              But I got those words right, correct?

5              Correct?  You said --

6    A.    Yes.

7    Q.    -- *a little bit of weed*?

8    A.    **Yes.  I believe I said that.**

9    Q.    *Mr. Jackson, I smell a little bit of weed*.  Right?

10    Correct?

11    A.    **I don't believe I said *Mr. Jackson*.  I just said:**

12    ***I believe I smell a little bit of weed coming from the***

13    ***vehicle.***

14    Q.    All right.  Now, after all of this is said and

15    done and you get back to the police department and you

16    start writing this thing up, in the third paragraph I

17    see *a little bit of weed* has now transformed a bit.  It

18    says: *strong odor of cannabis coming from inside the*

19    *vehicle*.

20    A.    **Yes.  Cannabis -- his cannabis smelled very**

21    **strong.**

22    Q.    After the fact, you're saying?

23    A.    **When I came up to the vehicle, it smelled very**

24    **strong.**

25    Q.    Okay.  But what you said to Mr. Jackson is:  *Sir,*

1   *I smell a little bit of weed.*  Right?

2   **A.   Yes.**

3   Q.   Okay.  And when you say that to Mr. Jackson, you

4   don't say, *Mr. Jackson, I smell unburnt cannabis.*

5   Right?  You don't -- you didn't even distinguish it,

6   correct?

7   **A.   I did not tell him.**

8   Q.   Okay.  And in your report when you first make

9   reference to it, you say *the strong odor of cannabis*

10  *coming from inside the vehicle.*  You again don't

11  distinguish burnt from unburnt cannabis, correct?

12  **A.   Are you asking on the police report?**

13  Q.   Correct.  Yes.

14  **A.   I believe in the police report I did put that it**

15  **was unburnt cannabis, sir.**

16  Q.   I apologize.  You're correct.

17          In the second paragraph, in the last sentence,

18  you state:  *I could smell the strong odor of unburnt*

19  *cannabis coming from inside the vehicle.*  All right.

20          So I want to be clear.  That's before you were

21  presented with a bag of cannabis that he showed you,

22  right?

23  **A.   Yes.**

24  Q.   Okay.  And when I say *bag*, this is not a duffel

25  bag, right?

```
 1   A.   That's correct.
 2   Q.   This is a small, like, Ziploc baggie?
 3   A.   Yes.  Like a sandwich bag tied off.
 4   Q.   Okay.  And it's not stuffed in there, right?  It's
 5   a small amount?
 6   A.   I believe it's just over 2 grams.
 7   Q.   Okay.  Now, as far as in the timeline of events,
 8   you indicate to Mr. Jackson that you smell a little bit
 9   of weed, and Mr. Jackson shows you a bag of cannabis,
10   right?
11   A.   Yes.  During my interaction with him, he did.
12   Q.   All right.  And you ultimately -- your testimony
13   is it's about 2 grams.  Obviously, you're not weighing
14   it in that moment, correct?
15   A.   That's correct.
16   Q.   And, in fact, you're not even testing it in that
17   moment, right?
18   A.   That's correct.
19   Q.   It's just a visual, right?
20   A.   Yeah.  And he also identified it as weed.
21   Q.   Sure.
22        But you had no scientific conclusion about
23   that, right?
24   A.   Just my experience with it, as I said.
25   Q.   And then you ask him to give you his car keys?
```

```
 1   A.   I did.

 2   Q.   Okay.  And he did that?

 3   A.   He did.

 4   Q.   Now, he's not free to go, is he?

 5   A.   He's not.

 6   Q.   You have seized him, right?

 7   A.   At that moment, he had committed a Class A

 8   misdemeanor.  So, yes, he was being detained by me.

 9   Q.   Okay.  And that Class A misdemeanor was what?

10   A.   Possession of cannabis in a motor vehicle in an

11   unauthorized baggie.

12   Q.   Okay.  But you hadn't tested it yet, --

13   A.   Correct.

14   Q.   -- right?  Okay.

15        And at that point, you ask him to step out of

16   the vehicle -- right? -- of which he does?

17   A.   Yes.

18   Q.   And you take hold of his arm and guide him to the

19   back of the vehicle?

20   A.   I just placed my hand on the back.  I didn't

21   actually grab him or anything.  I just placed my hand

22   on the back of his arm.

23   Q.   All right.  Beginning to end of all of this is

24   about five to six minutes?

25   A.   I believe that's accurate.
```

```
 1              MR. SCHIERER:  Judge, could I have a quick
 2   minute to look through my notes?
 3              THE COURT:  Yeah.  Take your time.
 4              (Brief pause in proceedings.)
 5   BY MR. SCHIERER:
 6   Q.  One thing about his demeanor -- and let me
 7   distinguish here before he takes off running.
 8              But up and to that point, his demeanor is
 9   cooperative, correct?
10   A.  I would say so.
11   Q.  Not combative?
12   A.  No.
13   Q.  You've seen a lot worse, I gather?
14   A.  Yeah.
15   Q.  The lighting on University Avenue in that area,
16   there's exterior street lighting, correct?
17   A.  Yes.  There's street lamps.
18   Q.  And there's businesses there that are all lit up,
19   correct?  Such as the Taco Bell?
20   A.  Sure.
21   Q.  And I do understand that you've observed a vehicle
22   driving without its lights on; but other than that, you
23   did not observe any other traffic violations from this
24   vehicle, correct?
25   A.  Prior to the traffic stop?
```

```
 1    Q.   Yes.
 2    A.   Yes.
 3    Q.   Appropriate speed, right?
 4    A.   Yes.
 5    Q.   Appropriate turns, correct?
 6    A.   Yeah.
 7    Q.   And since we have a divided roadway, the vehicle's
 8    contained within one lane, right?
 9    A.   Yes.
10    Q.   Okay.  Now, it was your, your testimony -- I think
11    you were asked about your training, your professional
12    training, on unburnt versus burnt?
13    A.   Yes.
14    Q.   Okay.  So they -- they've provided you with
15    specific training on that?
16    A.   Yes.  I've received training on that.
17    Q.   Now, is that on-the-job training -- that you
18    experienced it by making traffic stops and busts -- or
19    do they sit you in a room and have you smell different
20    cannabis?
21    A.   So the Police Training Institute, they allow you
22    to smell unburnt cannabis, and then they burn a small
23    amount of cannabis so you can smell what it smells
24    like.
25              And then at the police department, with
```

1  **Urbana, you have extensive training with one of the**
2  **narcotics detectives that shows you what unburnt**
3  **cannabis smells like versus burnt cannabis.**
4  Q.  All right.  And some unburnt cannabis has a
5  stronger smell than others.  Would you agree with that?
6  **A.  Yes.**
7  Q.  All right.  And in this instance, when you
8  approached the vehicle with the windows up, you smelled
9  nothing, --
10  **A.  That's correct.**
11  Q.  -- right?  All right.
12         But that's not always the case, right?
13  Sometimes you can literally smell it with the windows
14  up?
15  **A.  Yes.**
16  Q.  And that didn't cause you any suspicion until you
17  began to have this conversation with the window down,
18  right?
19  **A.  Yes.**
20  Q.  And that's -- when you responded to that smell,
21  you said to Mr. Jackson:  *I can smell a little bit of*
22  *weed*.  Right?
23  **A.  Yes.**
24  Q.  I don't remember from the video -- and maybe I
25  misheard -- but was there a question about you

```
1   indicating that you would cut breaks if the individual
2   made certain admissions to you?
3   A.   Yeah.  Usually if, if I smell cannabis and they
4   don't lie and immediately provide me with the cannabis,
5   I will just write a traffic warning violation for the
6   adult use cannabis, unless it's over a certain amount.
7   Q.   But in, in -- in this case, you initially had
8   asked him about whether or not he had smoked it, right?
9   A.   I did ask him if he smoked it.
10  Q.   All right.  And he denied that, correct?
11  A.   He admitted to me that he had smoked.
12  Q.   No.  In the vehicle.
13  A.   Oh, I apologize.  Yes.  He denied smoking in the
14  vehicle.
15  Q.   Okay.  And you had no observation of smoke -- of
16  burnt cannabis in that vehicle, right?
17  A.   Correct.
18  Q.   And then Mr. Jackson shows you the bag of weed,
19  right?
20  A.   He did.
21  Q.   But you didn't cut him a break, did you?
22  A.   I had not determined at that time if there was any
23  other cannabis within the vehicle.
24  Q.   Well, did you distinguish for him that that's what
25  the break was going to be for?
```

```
 1   A.   I did not.

 2             MR. SCHIERER:  Thank you.  Those are my

 3   questions.

 4             THE COURT:  Mr. Lynch.

 5             Just out of curiosity, am I going to see this

 6   video?  Not that I have to have it.  I'm just curious.

 7   You're both talking about it.

 8             MR. LYNCH:  [Nodding head up and down.]

 9        REDIRECT EXAMINATION OF PHILLIP BARRIE

10   BY MR. LYNCH:

11   Q.   Officer Barrie, were the events that you have just

12   testified to captured on body cam?

13   A.   Yes, they were.

14   Q.   Did you have occasion to review that body cam

15   prior to your testimony today?

16   A.   I did.

17             MR. LYNCH:  And I have it plugged in.  Will

18   you stipulate?

19             MR. SCHIERER:  We stipulate --

20             MR. LYNCH:  Okay.

21             MR. SCHIERER:  We stipulate to that, Judge.

22   BY MR. LYNCH:

23   Q.   Government's Exhibit 1 is a USB drive inserted

24   into my computer.  Did you review that before your

25   testimony today?
```

1    A.   I did.

2    Q.   Okay.  Before we go further, Officer, a couple

3    final questions.

4              Am I correct in hearing you that some of the

5    signs of DUI that you were taught to look for include

6    odor and IVC violations?

7    A.   Correct.

8    Q.   When you spoke to Mr. Jackson, had you observed

9    any IVC violations before you spoke to him?

10   A.   Yes.

11   Q.   What was that?

12   A.   **He was driving without his headlights or**

13   **taillights activated.**

14   Q.   And at midnight on a public roadway, is that

15   illegal under the Illinois Vehicle Code?

16   A.   It is.

17             MR. LYNCH:  I have no further questions.

18             With the Court's permission, I'd like to

19   publish Government's 1.

20             THE COURT:  It sounds like -- and you're

21   stipulating that it's the, that it's the body cam that

22   we've been talking about?

23             MR. SCHIERER:  It is, Judge.  Yes.

24             THE COURT:  All right.  It can be admitted

25   into evidence, and I'll watch it.  Go ahead.

```
 1              (Government's Exhibit 1, a video clip,

 2              is published in open court.)

 3          MR. LYNCH:  I've stopped the video playback at

 4    16:43.

 5    BY MR. LYNCH:

 6    Q.  Officer Barrie, am I correct that the video there

 7    ended approximately at the time that you placed your

 8    hands upon Mr. Jackson and got ahold of him?

 9    A.   That's correct.

10          MR. LYNCH:  Nothing further.

11          THE COURT:  Mr. Schierer.

12          RECROSS-EXAMINATION OF PHILLIP BARRIE

13    BY MR. SCHIERER:

14    Q.  Officer, now that we've watched the video, you

15    would agree that the lighting in that area, it was

16    pretty well lit, correct?

17    A.   In that specific area, yes.

18    Q.  Okay.  And one of the very first things that you

19    indicated to Mr. Jackson was that you had no problem

20    giving him a warning, correct?

21    A.   Correct.

22    Q.  And he immediately showed you his identification,

23    right?

24    A.   He did.

25    Q.  And he immediately retrieved documents from his
```

```
 1   glove box to find a proof of insurance, right?
 2   A.   Yes.
 3   Q.   He retrieved documents that were all stapled
 4   together, correct?
 5   A.   Yes.
 6   Q.   Handed them to you, right?
 7   A.   He did.
 8   Q.   They were the appropriate documents, correct?
 9   A.   Yes.
10   Q.   And you read through those documents, right?
11   A.   I was looking for a policy number and --
12   Q.   I understand.
13          But you took your eyes off of the suspect to
14   read a document, right?
15   A.   Yes.
16   Q.   All right.  So you weren't in that moment at all
17   afraid that anybody was going to shoot you, were you?
18   A.   No.
19   Q.   Because you wouldn't have taken your eyes off of
20   them if you were, right?
21   A.   Correct.
22   Q.   All right.  And you then asked him if he was safe
23   to drive, right?
24   A.   I did.
25   Q.   And he says "yes"?
```

```
 1  A.   Yes.
 2  Q.   And you accepted that answer, right?
 3  A.   I didn't accept the answer.
 4  Q.   Well, sir, at any moment did you say:  You're
 5  gonna conduct field sobriety tests?
 6  A.   I had not got to that point.
 7  Q.   Okay.  But you never -- those words never came out
 8  of your mouth, right?
 9  A.   Correct.
10  Q.   Now, with regards to cutting breaks, that was
11  within the context of you asking if there were weapons,
12  right?
13  A.   I believe I --
14  Q.   Do you recall that?
15  A.   I believe I asked him if there was weapons or
16  drugs or firearms in the vehicle.
17  Q.   Okay.  And you had asked him right before he
18  exited the vehicle to not reach for his waistband,
19  right?
20  A.   I did.
21  Q.   And he immediately responded to your commentary
22  with, Hey, I didn't -- right? -- putting his hands up,
23  correct?
24  A.   He did reach for --
25  Q.   Okay.
```

```
 1   A.    -- his waistband, but then put his hands up.
 2   Q.   So, in other words, you asked him a question; he
 3   immediately perceived what that question was and gave
 4   you an appropriate response, right?
 5   A.   Yes.
 6   Q.   All right.  And none of his movements in there in
 7   any way appeared as if he was intoxicated, correct?
 8   A.   I had not been able to formulate my overall
 9   opinion yet.
10   Q.   And, and despite the fact that you didn't put in
11   any of your reports that you were investigating drunk
12   driving or impaired driving, it's your testimony in
13   court today -- in Federal Court -- that you were really
14   investigating impaired driving?
15   A.   Yes.
16   Q.   That's your testimony?
17   A.   Yes, sir.
18             MR. SCHIERER:  Thank you.
19             THE COURT:  Anything, Mr. Lynch?
20             MR. LYNCH:  Nothing further, Your Honor.
21             May I approach with the exhibit?
22             THE COURT:  Yes.  It's on a USB drive?
23             MR. LYNCH:  Yes.
24             THE COURT:  Okay.  I'll take that.
25             All right.  You have nothing further,
```

1    Mr. Lynch.

2            Mr. Schierer, you got anything?

3            MR. SCHIERER:  No, sir.

4            THE COURT:  Obviously, I'm not going to rule

5    on this from the bench.

6            You can step down.  Thank you, Officer Barrie.

7                    *(Witness Barrie is excused, 2:18 p.m.)*

8            THE COURT:  Let me ask you this:  Do you want

9    to give me arguments now?  Or do you want a copy of the

10   transcript and file supplemental briefings based on

11   what you've got in the record now?

12           MR. SCHIERER:  I'd do it now.  I mean, I'm

13   happy to -- well, --

14           THE COURT:  I mean, you can think about it for

15   a second.  I mean, this is -- obviously, this is very

16   detail-specific.  So I don't know, now that we've got a

17   transcript, if you want to work off of that and file a

18   supplemental briefing or what you want to do.

19           MR. SCHIERER:  I'm ready to make brief

20   arguments, request the transcript, and file something

21   supplemental if I think it's outside of what I'm about

22   to argue.

23           THE COURT:  I'll do whatever you -- whatever

24   you want to do is going to be all right with me.  I

25   just want to --

1          MR. LYNCH:  I'm, I'm prepared to respond
2     today, Your Honor.
3          THE COURT:  Okay.  Go ahead.
4          MR. SCHIERER:  Do you mind if I do it from the
5     podium?
6          THE COURT:  You can do it from whichever place
7     you want.
8          MR. SCHIERER:  I don't know why.  I just like
9     podiums, I guess.
10         Judge, the Fourth Amendment protects people
11    against unreasonable searches and seizures.
12         And I understand what this might appear at
13    first blush.  At first blush, we got a person told to
14    get out of a car, and he takes off running.  Okay?  At
15    first blush, we don't even really think twice about it.
16         But if we slow it down, --
17         THE COURT:  Well, I'm not starting there.  I'm
18    starting way back from the beginning, from the stop.
19         MR. SCHIERER:  -- and, and -- good.
20         THE COURT:  I'm trying to take it step by
21    step.
22         MR. SCHIERER:  Good.  And I think that we're
23    on the same page.
24         So when I begin to break down these cases --
25    and we oftentimes see them as DUI cases -- but the

1    first thing:  Is this a consensual interaction between

2    police and citizen?  Obviously not.  Right?

3          Number two:  Is it a *Terry* stop?  Well, kind

4    of, sort of; but not really because he sees the lights

5    are out.  So he has probable cause.

6          Now, I know people blend the concepts.  It's

7    inaccurate.  But we can blend them in a sense.  But

8    let's say it's a probable cause stop.

9          But he decides immediately -- we heard him not

10    only in the testimony; we saw it on the video -- he

11    immediately says:  *I'm okay with giving you a warning*.

12    Immediately.  The purpose of the stop is over.  It's

13    over.  Unless he observes other things.

14          Now, what's he observe?  Nothing with his

15    eyes.  He doesn't see anything with his eyes.  No

16    weapons, no movements, no papers, no ash.  He's got

17    nothing.  Okay?

18          Now, he's observing something with his nose.

19    He's got another sense here.  And we have an

20    inconsistency because what do we hear on the video?

21    And initially on direct, I think he was honest.  *I*

22    *smelled a little bit of weed*.  A little bit.  And you

23    saw that bag of weed.  That was very small.  Come on.

24    Okay?

25          So, what actually happened here?

```
 1              And, Judge, what happened here is tragically
 2   why people stop trusting the system.  Now, I apologize
 3   if you view the world differently than I do.  I'm gonna
 4   tell you how I view it.  Please don't take offense to
 5   it.  But if that was a White kid, it never would have
 6   happened.  Period.  He's a Black kid.  He got pulled
 7   over.  And he smelled a small amount of weed.  And he
 8   gonna search because he thinks he gonna find something.
 9              Now, did he?  Yeah.  He found a gun.  All
10   right.  He found a gun.
11              Now, it's problematic here because people
12   every -- always think the ends justify the means.
13   Okay, we took a gun off the street.  I get that.  That
14   doesn't mean you don't have a Fourth Amendment right.
15   It also doesn't mean that law enforcement can misuse
16   power.  It doesn't mean that.
17              So, we have to break this down, slow it down.
18   It was a probable cause stop.  The officer made a
19   determination.  He's not arresting him.  He's not even
20   going to write up a warning, although he said he did.
21   And then he kind of tricks him.  It's interesting.  He
22   kind of tricks him because he gets his conversation.
23   *Oh, okay, yeah*.  *Everything's hunky-dory*.  *Hand me your*
24   *keys*.
25              The second those keys go in his hands, he
```

1   goes:  *And, by the way, I'm gonna search you and your*
2   *car.*  And the whole thing changes.

3           Now, Mr. Jackson runs.  I get it.  Okay.  Is
4   that wrong?  Of course it's wrong.  We can't have that.

5           Does he not have a -- or he has a firearm he's
6   not supposed to?  Yeah.  That's wrong.  I'd argue that
7   that's an inappropriate decision; that we should not
8   strip people of constitutional rights even when they're
9   felons.  Okay?  I know; nobody asked me, but ....

10          THE COURT:  If it makes you focus your
11  argument more, I'm not concerned about anything that
12  happened from the time Mr. Jackson took off running.

13          MR. SCHIERER:  Okay.

14          THE COURT:  I'm worried about what happened
15  before then.

16          MR. SCHIERER:  That's fair.  Thank you.

17          But what we have here is two main issues.  The
18  original purpose of the stop was over.  He delayed it
19  without probable cause.  Period.

20          And with all due respect to the officer.  He's
21  not being candid, and that's disappointing.  He's not.
22  He's not telling the truth.

23          Now, can I prove it?  No.  I don't have a way
24  to do that, but you can get a sense he ain't telling
25  the truth.  And there's only one way to solve this

1  problem, is for this Court to make a real tough choice.

2  And that's to grant this motion, and this case goes

3  away.  And in the future law enforcement handles things

4  appropriately.

5          THE COURT:  Let me ask you a legal question.

6          MR. SCHIERER:  Yes, sir.

7          THE COURT:  So there's a, there's an Illinois

8  appellate case, *People v. Stribling*.

9          MR. SCHIERER:  *Stribling*.  It's Supreme Court.

10          THE COURT:  Illinois Supreme Court case.

11  Thank you for correcting me.

12          And then there's a couple -- doing some

13  research on that, there's a couple of Illinois

14  appellate cases that are sort of leaning that

15  direction, --

16          MR. SCHIERER:  Yes.

17          THE COURT:  -- saying that basically

18  marijuana, burnt or unburnt -- I think -- I might have

19  this backwards -- I think *Stribling* was burnt, and

20  there's some Illinois appellate cases talking about --

21  that don't distinguish between burnt and unburnt.

22          But they say marijuana cannot give you --

23  without some corroborating factors or other indicia

24  that something's going on -- it cannot give you enough

25  to search a car.

1        MR. SCHIERER:  Correct.  I agree with that

2   analysis.  Yes.

3        THE COURT:  All right.  That's my rough

4   summary of the current state of, as I see it, Illinois

5   law headed in one direction.

6        Then as I'm sitting here as a federal district

7   judge, I have federal cases that have not been

8   overturned that say marijuana odor, burnt or unburnt,

9   does give probable cause.  Now, most of those cases, at

10  least the ones that I found, the big one being *U.S. v.*

11  *Mosby* -- it's a Seventh Circuit case -- says that the

12  smell of marijuana can give probable cause.

13        MR. SCHIERER:  Okay.

14        THE COURT:  What do I do in that -- what's,

15  what's your take?  I mean, I'm not the -- I'm going to

16  have to figure this out.  But, obviously, I have to

17  follow federal law; but, at the same time, most of

18  these cases are before it became legal in Illinois to

19  have marijuana.

20        So where do you think I should go with this?

21        MR. SCHIERER:  Thank you for asking that

22  question.  It's a huge question.  Here is the best

23  answer I can give you:  We cannot have a process where

24  they violate state law, but they walk it down the

25  hallway and hand it off to the federal prosecutors

1  because it would have been legal under federal law.

2        This officer was acting under state color.  He

3  was a state actor.  He's not a federal law enforcement

4  agent.  He needs to follow Illinois law, and that

5  Illinois law -- this was illegal under Illinois law.

6  And you can't hand it off to the feds to make it legal

7  because what's going to happen?  They're just going to

8  start handing stuff off to the Feds to get around that,

9  and we can't have a process like that.  We have to

10  believe in the system.  It has to work.  And when you

11  do stuff like that, it doesn't work; and it's why

12  people don't believe it.  And that's a problem.

13        THE COURT:  Well, to give both of you an

14  advisory, I'm going to have to do research -- and by

15  me, I mean mostly my law clerks.  I'm going to have to

16  look this up.  I may be asking you to file supplemental

17  legal -- I don't know if it's an easy answer or not.

18  It might be glaringly obvious, and the Seventh Circuit

19  might say to me that I'm an idiot.

20        But, you know, I see an issue when I have the

21  State Court saying one thing and then the Federal Court

22  saying the exact same opposite -- the exact opposite

23  about the same conduct.  And I'm not sure -- I'm not

24  sure I'm going to find a case that tells me how I

25  should rule on that circumstance directly.

1          MR. SCHIERER:  This will be in the Supreme

2    Court at some point.  Now, is it five years or

3    ten years?  Ultimately, that's where we're headed.

4          THE COURT:  Hopefully, with enough other

5    case -- other states legalizing marijuana, it won't be

6    out of this court.

7          MR. SCHIERER:  Grant the defendant's motion

8    and let the government appeal and --

9          THE COURT:  All right.

10          Mr. Lynch, you want to give me your, your

11    argument?

12          MR. LYNCH:  Thank you, Your Honor.

13          THE COURT:  I think from my questions and my

14    statements, you know which way I'm headed.

15          MR. LYNCH:  And I will focus the bulk of my

16    response on that.

17          Primarily, I would argue that this Court can

18    dispose of the issue because at the time that the gun

19    was discovered, Mr. Jackson wasn't seized.  There's no

20    search that he can complain about because the gun was

21    not discovered pursuant to a search.  The gun was

22    discovered in plain view during his flight from

23    officers, at which time he simply wasn't seized.

24          THE COURT:  So you don't think when the

25    officer took the keys from the car that that was a

1    seizure?

2         MR. LYNCH:  Your Honor, he was --

3         THE COURT:  Do you think he was free -- let

4    me -- I'll rephrase it.

5         Do you think he was free to go at that point?

6         MR. LYNCH:  He was not free to go.

7         Now, are we complaining about a search of the

8    vehicle itself?  No.  Officer Barrie never got into the

9    inside of the vehicle.

10        Is he complaining about a search of his person

11   at the time the officer was about to pat him down?  No.

12   Officer Barrie never got the chance to do that because

13   the defendant ran away.

14        So, he's not seized at that point in time when

15   he's running away, and then he produces in plain view a

16   handgun.  That isn't in dispute.

17        So the Court can sidestep almost the entirety

18   of the stop by ruling he wasn't seized.  Analogously,

19   he wasn't searched because it was produced in plain

20   view.  And there's no Fourth Amendment issue at hand.

21        THE COURT:  Okay.

22        MR. LYNCH:  Now, I will devote the remainder

23   of my time to addressing the stop.

24        Your Honor, this stop was precipitated by the

25   observance of an Illinois Vehicle Code violation.

```
1    Officer Barrie testified to that.  He needs reasonable

2    suspicion to effect the stop.  He pulled him over; made

3    contact with Mr. Jackson.

4            He did inform him that he was going to write

5    him a warning.  However, as the Court's well aware,

6    consistent with every stop, an officer can ask for

7    license, insurance, confirm identity, even run a

8    warrant check.

9            In this case, in that process -- and the Court

10   just watched the video; it was perhaps five minutes

11   long -- in that process, Officer Barrie testified that

12   he smelled weed coming from the interior of the

13   defendant's vehicle.  He inquired further.  The

14   defendant said yes; he had been smoking cannabis.

15           Officer Barrie testified that part of DUI can

16   be -- or a DUI investigation can involve his smell,

17   sensing, there might be a substance at issue.  He

18   inquired:  Is there a substance at issue?  Mr. Jackson

19   said yes he had smoked.  And there was a suggestion

20   there may be more substance inside the vehicle,

21   sustaining his belief that DUI may be an issue.

22           Secondarily, Officer Barrie testified -- and I

23   believe it's correct under state law -- that the smell

24   of cannabis inside of a motor vehicle can provide

25   grounds to search the vehicle under Illinois state law
```

1    for improperly contained cannabis.  How is it

2    improperly contained?  He can smell it.

3            Now, the defense is attempting to distinguish

4    here -- and the Court has, perhaps, cited some case

5    law -- stating that the smell alone isn't enough.  But

6    here, Officer Barrie had more information at hand.

7            The defendant said:  *I have smoked but not*

8    *inside the car*.

9            So, Officer Barrie's smell of cannabis coming

10   from inside the car, if we take the defendant at his

11   word, wouldn't be from his own smoked cannabis from

12   before he got inside the car.

13           So with Officer Barrie having that information

14   on hand, his belief that there was other cannabis

15   inside of the car is even stronger because he could

16   smell unburnt cannabis.  Juxtapose that with the

17   defendant's admission that he had smoked cannabis not

18   inside the car.

19           The stop then proceeds with him getting the

20   defendant out of the car after he's been handed the

21   illegally packaged substance, a Class A misdemeanor

22   which he would be arrestable for.

23           So, Your Honor, if you want to pause things at

24   this point in time, Mr. Jackson -- had he complied with

25   the officer's commands -- would have been arrested and

1    patted down.  The gun would have been discovered.

2            He gets out of the car though.  The officer

3    says:  *I'm going to pat you down*.  You heard the

4    officer that SFSTs, field sobriety tests, were down the

5    road.  The officer goes to pat him down, and he runs.

6            So taken as a whole, the officer's actions

7    were justified under Illinois State law the entirety of

8    the time.  It's a probable cause stop for the lights

9    violation, observance of an actual misdemeanor

10    violation by being handed the cannabis, the admission

11    the defendant had smoked not inside the car -- and the

12    location is relevant here -- and then attempting to

13    further determine what other crimes may be at hand, be

14    it further packaging crimes, be it further drug

15    possession crimes, be it DUI.  That, of course, was

16    frustrated by the defendant's flight where the gun was

17    eventually discovered in plain view.

18            I will also point out that Your Honor did note

19    one of the cases the government cited, stating that

20    cannabis remains something that can give rise to

21    probable cause to search a vehicle for.  To the extent

22    the Court will rule on state law, however, I've

23    justified it under those circumstances, I believe.

24    First and foremost, however, I will argue that this is

25    a plain view case.  The defendant was running away.  He

1  took the gun out in plain view.  There's no search to

2  suppress.

3        THE COURT:  Got it.  All right.  Thanks for

4  giving me a really straightforward, easy, not a lot of

5  collateral issues suppression motion.  And both of you

6  are now chuckling.  Yeah.

7        This isn't something I'm going to be able to

8  do overnight.  I'm going to have to do some research on

9  this, so you can expect a -- plus, we have Thanksgiving

10  coming up so I -- and I have a trial this week and next

11  week.  So I'll get to it when I can.  I mean, I'll try

12  to do it as fast as I can.  It's going to take a while.

13  There's a lot of issues involved in this.

14        MR. SCHIERER:  Do we have a trial set in this

15  case?

16        THE COURT:  So my courtroom deputy here just

17  said we have a status set for Monday.  Rather than

18  waste everybody's time -- and our trial is set for the

19  13th.  Let me look at my calendar here.

20        MR. SCHIERER:  13th of --

21        THE COURT:  December.

22        MR. SCHIERER:  And, Judge, my memory is that's

23  the day we set a couple of my cases for trial.

24        THE COURT:  Oh, I have -- I have 28 criminal

25  cases set that day.  Everybody wanted to get in right

1  before the holidays.  That's a reality.  Not at the

2  Court of Appeals.  You know, they can control the

3  calendar more.  This is more me trying to -- this is

4  sort of the post-pandemic flood.

5          Okay.  Well, I'll ask you, Mr. Schierer -- I

6  mean, my inclination is that I should probably move

7  that trial date because with -- you're nodding your

8  head.  I think -- I mean, that's not going to be

9  realistic, I think, under the circumstances.

10          MR. SCHIERER:  I agree 100 percent.

11          THE COURT:  So ....

12          MR. SCHIERER:  Now, Judge, I'm looking at that

13  list.  I see two of them, Beasley and Gaumer.  Both of

14  those are pleading tomorrow, so those are --

15          THE COURT:  Beasley and who?

16          MR. SCHIERER:  Gaumer.  Both of those are

17  going to fall off.

18          THE COURT:  All right.  So Beasley has a

19  codefendant, Vassar.  Do you know what he's doing?

20          MR. SCHIERER:  I don't know.

21          THE COURT:  And Gaumer has a codefendant,

22  Champanine.

23          MR. SCHIERER:  I don't know on that.

24          THE COURT:  So, for each of those, one of the

25  two defendants will be leaving, but the other one --

1          MR. SCHIERER:  Okay.  Yep, yep.  Sorry.

2          THE COURT:  Well, one of my -- I mean, my

3    trial this week is a remaining codefendant out of a

4    group, so ....

5          MR. SCHIERER:  I got you.  Okay.

6          THE COURT:  So, looking at the calendar then,

7    the next place I'm stacking up criminal cases is

8    January 17th.  What I can do is if I, if I end up

9    deciding I'm going to grant the motion to suppress, we

10   can merely set a status hearing to find out what the

11   government is doing.

12         MR. SCHIERER:  Okay.

13         THE COURT:  If I deny the motion to suppress,

14   we can use that January 17th as a holding.  I could set

15   a status hearing sometime before that, and you can tell

16   me what you want to do.

17         MR. SCHIERER:  Okay.  I just -- I want to put

18   on the record:  I couldn't do a trial that week.  I

19   could do a status hearing that week.

20         THE COURT:  Sure.

21         MR. SCHIERER:  I cannot do a trial the week of

22   January 17th.

23         THE COURT:  Okay.  Let's see, what's the

24   number on this case?  '22.  I have 14 other trials that

25   week.  All of them are older with in-custody people, --

```
 1              MR. SCHIERER:  Okay.
 2              THE COURT:  -- two of them with Mr. Zopf,
 3    who's now walked in; he's got the next sentencing
 4    coming up.  So he would bump you if he said one of his
 5    clients wants to go to trial, so ....
 6              All right.  Why don't we just do that.  If I
 7    grant the motion, we're going to set a status hearing
 8    right away --
 9              MR. SCHIERER:  Yeah.
10              THE COURT:  -- to find out what we're going to
11    do.
12              Does that sound plausible to you, Mr. Lynch?
13    Does that sound like a good idea?
14              MR. LYNCH:  Yes, Your Honor.
15              THE COURT:  Okay.  So the February 13th jury
16    trial is vacated.  I'm sorry.  The December 13th trial
17    is vacated.  The matter is set over for trial on
18    January 17th.  I'll set a status hearing right now in
19    case I deny the motion for -- no, I'm not.  I'm not.
20    That's a waste of time.
21              Let me rule on the motion, and we'll figure
22    out where we're headed.
23              MR. SCHIERER:  Yes, Your Honor.
24              THE COURT:  That makes more sense to me.  All
25    right.
```

1          So other than making speedy trial -- I'm going

2   to make some speedy trial findings even though -- the

3   motion's still pending.  Speedy trial's been tolled.

4          Anything else you want me to do for the

5   government?

6          MR. LYNCH:  No, Your Honor.  Thank you.

7          THE COURT:  Anything else, Mr. Schierer?

8          MR. SCHIERER:  No, sir.  Thank you.

9          THE COURT:  All right.  So based on all the

10  discussions with counsel, pursuant to the various

11  sections of the Speedy Trial Act that apply, the Court

12  finds that all the time from today's date to not only

13  the ruling upon the motion but any additional time

14  under 3161(h)(7)(A) involving the ends of justice

15  served by granting and moving the trial, tolls -- all

16  tolls the Speedy Trial Act until December -- well, what

17  did I just say? -- January 17th, 2023.

18          MR. SCHIERER:  Thank you.

19          THE COURT:  I think that's a -- there's a lot

20  of stuff in play just in that speedy trial finding.

21  Any objection to any of that, Mr. Schierer?

22          MR. SCHIERER:  None.

23          THE COURT:  Sound good?

24          All right.  So I'll let you guys know after I

25  make a ruling.

1          All right.  That will be all for the record.

2                    *(Hearing concludes, 2:37 p.m.)*

3

4      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

5

6                    REPORTER'S CERTIFICATE

7          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby

8    certify that the foregoing is a correct transcript from

9    the record of proceedings in the above-entitled matter.

10         Dated this 18th day of May, 2023.

11

12         _____s/Lisa Knight Cosimini_____
           Lisa Knight Cosimini, RMR-CRR
13         Illinois License # 084-002998

14

15

16

17

18

19

20

21

22

23

24

25